```
UNITED STATES DISTRICT COURT           FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
PETER VERESAN,                         :
                                       :
                    Plaintiff,         :     MEMORANDUM
                                       :     AND ORDER
        - against -                    :
                                       :     06 CV 5195 (JG)
MICHAEL J. ASTRUE, COMMISSIONER        :
OF SOCIAL SECURITY,¹                   :
                                       :
                    Defendant.         :
----------------------------------------------------------------- X
```

A P P E A R A N C E S :

    KLEE & WOOLF, L.L.P.
        350 Willis Avenue
        Mineola, NY 11501
    By:   Andrew Woolf
        Carolyn Rose
        Attorneys for Plaintiff

    ROSLYNN R. MAUSKOPF
        United States Attorney
        Eastern District of New York
        One Pierrepont Plaza, 14th Floor
        Brooklyn, NY 11201
    By:   Jennifer E. Schantz
        Attorney for Defendant

JOHN GLEESON, United States District Judge:

        Peter Veresan brings this action pursuant to 42 U.S.C. § 405(g), asking me to review a final decision by the Commissioner of Social Security that Veresan is not entitled to disability insurance benefits. On March 16, 2007, I held oral argument on the Commissioner's motion for judgment on the pleadings. I conclude that the Commissioner committed legal error

---

       ¹    Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this action.

by not sufficiently explaining his final decision. Accordingly, for the reasons set forth below, the motion is denied, and the case is remanded to the agency for further proceedings.

BACKGROUND

Veresan alleges he has been disabled since November 14, 1999, as a result of injuries he sustained to his neck and back by picking up a heavy object while repairing a bus. R. 60; 74. Veresan has received workers' compensation benefits for those injuries. R. 63; 774.

Records submitted to the administrative law judge ("ALJ") indicate that Dr. Neil Morgenstern, a physical medicine and rehabilitation specialist, examined Veresan two days after the injury. Morgenstern concluded that Veresan was disabled, finding restricted motion in Veresan's cervical, thoracic, and lumbar spine, with muscle spasms of the bilateral cervical and lumbar paraspinal musculature. R. 243-47. On November 23, 1999, neurologist Jatinder S. Bakshi examined Veresan and found tenderness, paraspinal muscle spasm, and a restricted range of motion of Veresan's cervical spine. R. 100-01. Bakshi's impression was cervical muscle post-traumatic sprain syndrome, ruling out cervical radiculopathy and thoracic myofascitis. R. 102. Bakshi found Veresan temporarily totally disabled. *Id.*

On January 10, 2000, Veresan underwent an MRI ordered by Morgenstern. That test indicated that Veresan had a C5-6 central and left paracentral disc herniation, leading to central and left-sided canal stenosis and left-exit foraminal stenosis, and C4-5 and C6-7 bulging discs without significant canal or foraminal stenosis. *See* R. 288-89. Dr. Robert Michaels noted that the results of this MRI showed a "clear-cut" cervical herniated disc, but his examination of Veresan was "equivocal," showing no paraspinal muscle spasm in the cervical spine and full motor strength through the thoracic and cervical spines. R. 107. Michaels recommended

2

continued conservative treatment. *Id.* On April 5, 2000, Dr. Robert Donadt, an orthopedic surgeon, concluded upon examination that Veresan had cervical sprain and a left-sided herniated disc with bilateral arm radiculitis, lumbar sprain with mechanical low back pain, and bilateral leg radiculitis. Donadt did not find Veresan to be a candidate for surgery, however. R. 126. From late 1999 to mid-2000, Veresan was regularly attending physical therapy, and he was also receiving injections for pain from Morgenstern and other physicians. *See* R. 251; 280-81; 319-20; 326; 347-48; 349-50.

On February 16, 2001, Veresan had a thoracic spine MRI, which indicated broad-based disc herniation at the T6-7 level, and focal posterior disc herniation at the T8-9 level, with discs abutting the cord at both sites, but no compression, edema, or paraspinal masses. R. 151; 419. From early 2001 to mid-2002, Bakshi examined Veresan several times, and found, *inter alia*, the flexion and extension of his cervical spine to be 30 degrees. Bakshi authorized continued physical therapy and medication. *See* R. 144-45; 153-54; 198-201; 204-05. Donadt also saw Veresan several times from late 2001 to mid-2002; his findings were essentially unchanged. *See* R. 114-23. On February 21, 2002, Donadt administered diagnostic cervical discograms on the C4-5, C5-6, and C6-7 levels to determine the cause of Veresan's continued pain. *See* R. 212-18. Donadt concluded that the C4-5 and C5-6 discs were abnormal. *Id.* On June 4, 2002, Donadt noted, "I again discussed the surgery and risks and told [Veresan] that he does not have to have the surgery, but I do feel it has a good chance of helping and I agree with him trying any other modalities or injection before agreeing to the surgery." R. 117.

On August 8, 2002, Donadt performed C4-5 and C5-6 discectomies with decompression and fusion on Veresan. R. 217-19. After the surgery, Veresan continued

3

treatment with Donadt, who on successive visits noted continued improvement in his symptoms. R. 110-13. Despite that improvement, however, Veresan reported continued pain and stiffness. *See* R. 598-99; 600-03; 604-05; 606-07; 608-10; 611-12; 613-15; 616-17; 618-19; 620-21; 622-23; 624-25; 626-27; 628-29; 630-31; 632-33; 634-35; 636-37. In his most recent examinations (on February 8, 2005 and May 3, 2005), Donadt found "marked" tightness and tenderness in the cervical paraspinal muscles and trapezius and interscapular muscles, with a partial decreased range of motion, and tightness and tenderness in the lumbar paraspinal muscles, with decreased range of motion. R. 634-37. Donadt continued to opine that Veresan was disabled from working. *Id.*

Dr. Mitchell Weisman, a physical medicine and rehabilitation specialist, also noted improvement after Veresan's surgery, but nevertheless opined that Veresan was disabled from working. R. 168-69. On March 25, 2003, Weisman conducted electrodiagnostic studies, the results of which were consistent with mild bilateral cervical radiculopathy. R. 131-32.

On July 12, 2003, Dr. Jill A. Bressler, whom Veresan began consulting in approximately 2002, *see* R. 180, ordered two MRIs. The cervical spine MRI showed no disc pathology, bony encroachment on the spinal canal, or neural foramina. R. 185. The thoracic spine MRI showed moderate central disc bulges at the T6-7 and T8-9 levels, with cord contact present at both levels centrally, but with no cord compression. R. 186. On November 20, 2003, Bressler performed an EMG/NCV study, the results of which were consistent with left C7 cervical radiculopathy and mild left carpal tunnel syndrome. R. 187-88. Bressler cited these laboratory findings in a questionnaire she completed on March 1, 2005, along with the EMG/NCV performed by Dr. Weisman that was consistent with bilateral cervical radiculopathy.

4

R. 187-90. Bressler described Veresan as suffering from post-cervical fusion syndrome, thoracic disc cord syndrome, and chronic pain syndrome, with chronic depression. R. 180. According to Bressler, Veresan suffered chronic, daily, constant neck pain radiating to the upper extremities; severe back pain; limited head and neck movement; headaches; dizzy spells; fainting; "shock" sensations down the spine and arms; and severe depression. *Id.* Bressler also indicated that, *inter alia*, Veresan needed to lie down every hour for twenty minutes; could lift and carry less than five pounds occasionally; could sit, stand, and walk less than two hours in an eight-hour workday; could walk less than a block; and could never climb, stoop, kneel, balance, crouch, or crawl. R. 182-83.

Veresan filed an application for disability benefits on February 4, 2003. R. 60-62. The application was denied, and Veresan requested a hearing. R. 36-44. Veresan testified at the hearing that he could only walk for about one block, stand for intervals of about twenty minutes, and lift and carry objects weighing less than a gallon of milk. R. 779-82. He did not go out much, did not attend events outside the home with his family, and tried to help his wife with household chores by doing "little things" around the home. R. 69-73. In 2004, Veresan testified, he traveled to Nevada and Arizona with relatives, where he used the pool and jacuzzi, and visited the Hoover Dam and the casinos of Las Vegas. R. 787-88. He had to return home early, however, because his pain and stiffness obliged him to sleep on a recliner. R. 789. He testified that he sometimes had emotional responses to his pain. R. 771.

Dr. Warren Cohen, a medical expert, also testified at the hearing. R. 756-65. Cohen stated that a lumbar MRI exam that he reviewed did not show any abnormality. R. 757. He attributed the pain in Veresan's neck to the surgery and cervical radiculopathy. *Id.*

5

According to Cohen, that pain was the total of Veresan's medical problems. Despite the disc disease in the spine and that pain, Cohen testified, Veresan could lift and carry up to ten pounds occasionally and less than ten pounds frequently. R. 758. Cohen opined that Veresan could stand and walk for at least two hours and sit for about six hours in an eight-hour workday. *Id.* Cohen also commented that Bressler's report contained a recitation of plaintiff's subjective complaints. R. 764.

On October 21, 2005, the ALJ decided that Veresan was not disabled. R. 11-22. The Appeals Council denied Veresan's request for review on July 29, 2006. R. 5-8. More evidence of Veresan's treatment history was submitted to the Appeals Council. That evidence reflected, *inter alia*, that Versesan had another cervical MRI on March 6, 2001, which reflected degenerative disc bulging at the C5-6 level effacing the thecal sac and possibly touching the cord. R. 574. Dr. Ben Benatar did not believe this MRI was itself indicative of surgery, R. 576, though he found it might explain some left upper extremity radicular pain and some neck pain. R. 570-71. When presented with the later positive discograms, however, Benatar was of the opinion that surgery was a reasonable choice. R. 576.

DISCUSSION

My review is limited to whether the agency decision was "supported by substantial evidence in the record as a whole or [was] based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citing *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)) (internal quotation marks omitted). For the reasons set forth below, I conclude that the ALJ did not sufficiently explain the decision not to give the opinions of Veresan's treating physicians "controlling weight," and did not provide "good reasons" for the

weight the ALJ did give those opinions. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). As Veresan's eligibility for disability depends upon the weight assigned to different medical evidence in the record, I "cannot be certain whether or not the Commissioner's ultimate conclusion that plaintiff was not disabled is supported by substantial evidence." *Schaal*, 134 F.3d at 504. I therefore remand the case to the ALJ for reconsideration and, if benefits are denied once again, a sufficient explanation of the decision. *See id.* at 505.

Under the Social Security Act, Veresan is entitled to disability insurance benefits if, "by reason of [a] medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1).

The agency has broken the inquiry down into five sequential steps. *See id.* § 404.1520.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity

7

to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)) (internal quotation marks and brackets omitted). The ALJ determined that Veresan passed steps one and two, that with respect to step three Veresan's "discogenic and degenerative back disorder" did not meet "the criteria of any of the listed impairments," and therefore that the fourth inquiry into Veresan's "residual functional capacity" was required. R. 15. The parties do not dispute these determinations.

Rather, they join issue on the ALJ's decision that "the claimant retains the residual functional capacity to perform the exertional demands of sedentary work," and that his capacity "is not significantly diminished by non-exertional limitations."[2] R. 20. It was in making this decision that the ALJ considered the opinions of Veresan's treating physicians. The ALJ noted that those physicians' ultimate conclusions regarding Veresan's disability were not determinative. *See* R. 19; *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of findings -- including the ultimate finding of whether a claimant is disabled and cannot work -- are reserved to the Commissioner." (internal quotation marks and citation omitted)). The ALJ further noted that a treating physician's opinion "is generally accorded controlling weight in evaluating the nature and severity of a claimant's disability if it is well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with other substantial evidence in the record," and that "[o]bjective diagnostic treating source records are granted

---

[2] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying small articles. 20 C.F.R. § 404.1567(a). An individual must also be able to stand and walk occasionally. *Id.*

controlling weight." R. 19 (citations omitted). Applying this standard, the ALJ held that in Veresan's case:

> [T]he treating source records are based on subjective complaints and are not supported by the clinical findings. Moreover, a treating source statement that the claimant is disabled cannot itself be determinative.
>
> Although the claimant's treating neurologist and treating orthopedist recommended continued conservative treatment, and orthopedist Dr. Donadt did not feel that the claimant was a candidate for surgery and advised the claimant that he did not need surgery, the claimant elected to proceed with spinal surgery.

*Id.* (citation omitted). Accordingly, the ALJ did not give the treating sources controlling weight.

As the ALJ acknowledged, under the applicable regulations, a treating physician's opinion about a claimant's impairment is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134 F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

In this case, the ALJ addressed factor (ii) by determining that the treating sources' opinions were unsupported by clinical findings. The ALJ also considered Veresan's election of surgery, in light of earlier recommendations for conservative treatment, to be a relevant factor in the disability determination. But the agency decision did not consider the frequency of Veresan's examinations and his relationship with his doctors, as to which there is ample

9

evidence in the record. Nor does the decision explicitly weigh the consistency of the opinions of Drs. Bressler and Donadt with the rest of the record. Nor does it indicate what weight, if any, was given to the fact that those doctors are specialists. It is therefore not possible to determine the extent to which the ALJ considered those factors in reaching its determination, which means I cannot decide whether the ALJ's determination is supported by substantial evidence, or whether the ALJ applied the correct legal standard in determining the weight to give the treating doctor's opinions.

In addition to being deficient in these respects, the Commissioner's stated reasons for the denial of benefits failed to provide "good reasons in [his] notice of determination or decision for the weight [he] give[s] [a claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Specifically, the ALJ did not reconcile the assessment that the treating physicians' "records are based on subjective complaints and are not supported by the clinical findings" with evidence in the record of objective clinical findings both before and after his surgery that support Veresan's complaints. Before the surgery, a January 10, 2000 MRI indicated a C5-6 central and left paracentral disc herniation, leading to central and left-sided canal stenosis, as well as left-exit foraminal stenosis, and C4-5 and C6-7 posterior bulging discs. *See* R. 288-89. And a thoracic spine MRI on February 22, 2001 indicated broad-based disc herniation at levels T6-7, and focal posterior disc herniation at levels T8-9, with discs abutting the cord at both sites. R. 419; 574. Furthermore, diagnostic cervical discograms led Dr. Donadt to conclude that Veresan's C4-5 and C5-6 discs were abnormal. After the surgery, a thoracic MRI on July 12, 2003 showed moderate central disc bulges at levels T6-7 and T8-9, with mild central cord contact present at both levels.

10

R. 186.  And two EMG/NCV studies cited by Dr. Bressler were consistent with cervical radiculopathy.  R. 188-90.  The ALJ's decision does not explain why it discounted these objective findings in considering the weight to accord the opinions of Veresan's treating physicians.  Such an omission makes it difficult, if not impossible, to gauge why the ALJ decided to give less weight to those opinions.

Finally, a better explanation is needed for the Commissioner's reliance upon the pre-surgery opinions of certain of Veresan's doctors that he continue with conservative treatment in lieu of surgery, and upon Dr. Donadt's opinion that Veresan "did not need the surgery."  R. 19.  The relevance of those opinions to the ALJ's determination of what weight to give the rest of the treating physicians' opinions is neither explained nor apparent.  If they deserved weight at all, it is not clear why they deserved more weight than the opinion of Dr. Donadt that the surgery "ha[d] a good chance of helping" Veresan.[3]  R. 117.  Since the denial of benefits is sometimes based in part on claimants' decisions *not* to seek relief from pain via surgery, *see, e.g.*, *Taylor v. Chater*, No. 94 Civ. 5197 (JSM), 1995 WL 694466, at *6-7 (S.D.N.Y. Nov. 22, 1995), a fuller explanation of the decision here will both facilitate review and dispel any misimpression that either choice will result in a denial of benefits.

CONCLUSION

The Commissioner's motion for judgment on the pleadings is denied, and the case is remanded to the agency for further proceedings consistent with this opinion.  In the event the Commissioner once again decides not to give the treating physicians' opinions controlling

---

[3]  On remand, the ALJ should consider Dr. Benatar's opinion that surgery was a reasonable option given Veresan's positive discograms.  R. 576.

weight, he should, as explained with more particularity above, (1) further explain the justifications for that decision; (2) consider the opinion of Dr. Benatar; (3) explain, with reference to the factors set forth in the regulation, what weight, if any, the treating physicans' opinions have been given; and (4) explain the relevance in this case of Veresan's decision to have surgery.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
 June 29, 2007